Jeffrey H. Rutherford (*No. 181695*)
KENDALL, BRILL & KELLY, LLP
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067
Telephone:    (310) 556-2700
Facsimile:    (310) 556-2705
Email:        jrutherford@kbkfirm.com

Nimrod Haim Aviad (*No. 259705*)
CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, California  90071
Telephone:  (213) 622-4750
Facsimile:  (213) 622-2690
Email:      naviad@crowell.com

Attorneys For Petitioner,
*Yevgeny Selivanov*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| YEVGENY SELIVANOV, <br><br> Petitioner, <br><br> v. <br><br> XAVIER BECERRA, Attorney General, State of California, <br><br> Respondent. | **PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2254** |

1    Petitioner Yevgeny (Eugene) Selivanov, by his counsel of record, petitions

2  this Court for a Writ of Habeas Corpus, and by this verified petition sets forth the

3  following facts and causes for issuance of the writ.

4

5  Dated:    June 12, 2018                    Respectfully submitted,

6
                                             KENDALL, BRILL & KELLY, LLP
7
                                             */s/Jeffrey H. Rutherford*
8                                             Jeffrey H. Rutherford

9
                                             CROWELL & MORING LLP
10
                                             */s/Nimrod Haim Aviad*
11
12                                            Nimrod Haim Aviad

13
                                             Attorneys for Petitioner,
14                                            YEVGENY SELIVANOV

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION ................................................................................. 9

STATEMENT OF FACTS ................................................................... 9

    A.    The Entities Involved: Ivy Academia Charter School and Alternative Schools, Inc. .......................................................... 9

    B.    The Charges Under Review ...................................................... 11

        1.    The American Express Card Expenditures ............................... 11

        2.    The Capital Improvement Loan and Its Repayment .................. 14

    C.    California Charter School System ............................................ 17

        1.    The Charter School Act of 1992 ............................................. 17

        2.    The Power to Determine How Charter School Funds are Spent ...................................................................................... 17

PROCEDURAL HISTORY AND JURISDICTIONAL ALLEGATIONS ............ 18

    A.    Conviction on which petition is based ...................................... 18

    B.    Appeal to the California Court of Appeal .................................. 19

    C.    Petition for Review in the California Supreme Court ................. 19

    D.    Jurisdiction and Venue ........................................................... 20

STANDARDS UNDER THE ANTI-TERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996 ("AEDPA") ............................................... 21

CLAIMS FOR RELIEF ...................................................................... 22

Claim One: Mr. Selivanov's right to due process was violated because the California court of Appeal retroactively expanded California's embezzlement law thereby eliminating the required fair warning that a criminal statute must provide as to the conduct that it prohibits ............... 22

Claim Two: Mr. Selivanov's right to a jury trial was violated because his criminal sentence was increased beyond its statutory limits based on facts found to be true by the trial judge and not by the jury beyond a reasonable doubt ................................................................................ 27

    A.    Procedural Background ............................................................ 27

    B.    Argument ............................................................................... 28

        1.    The trial court's section 514 finding increased Mr. Selivanov's punishment by removing the offenses from "wobbler" status ...................................................................... 29

2.      The trial court's section 514 finding increased Mr.
        Selivanov's punishment because it imposed mandatory
        state prison incarceration ........................................................... 30

3.      The trial court's section 514 finding increased Mr.
        Selivanov's punishment because it barred Mr. Selivanov
        from holding public office ......................................................... 31

PRAYER FOR RELIEF ......................................................................... 32

4

1

<u>**TABLE OF AUTHORITIES**</u>

2

**Page(s)**

3

**Cases**

4

*Alleyne v. United States,*
5
    570 U.S. 99 (2013) ............................................................9, 28, 29, 30

6

*Apprendi v. New Jersey,*
7
    530 U.S. 466 (2000) ...................................................................*passim*

8

*Bouie v. City of Columbia,*
9
    378 U.S. 347(1964) .............................................................9, 24, 25

10

*Brooks v. North Carolina Dept. of Corrections,*
    984 F.Supp. 940 (1997) ....................................................................21

11

12

*Glover v. State of N.C.,*
    301 F. Supp. 364 (E.D.N.C. 1969) ..................................................21

13

*Grayned v. City of Rockford,*
14
    408 U.S. 104 (1972) ..........................................................................26

15

*Nunes v. Mueller,*
16
    350 F.3d 1045 (9th Cir. 2003) ..........................................................21

17

*People v. Hodges,*
18
    153 Cal. App. 2d 788 (1957) ...........................................................23

19

*People v. McClain,*
20
    140 Cal. App. 2d 899 (1956) ...........................................................23

21

*People v. Selivanov,*
    5 Cal. App. 5th 726 (2016)........................................................*passim*

22

23

*People v. Sisuphan,*
    181 Cal. App. 4th 800 (2010)......................................................23, 25

24

*People v. Stanfill,*
25
    76 Cal. App. 4th 1137 (1999)...........................................................29

26

*People v. Superior Court (Alvarez),*
27
    14 Cal.4th 968 (1997) .......................................................................29

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*People v. Wilcox,*
   217 Cal. App. 4th 618 (2013) ................................................................. 31

*United States v. Lanier,*
   520 U. S. 259 (1997) ...................................................................... 9, 24

*Wells v. One2One Learning Found.,*
   39 Cal. 4th 1164 (2006) ............................................................... 17, 18

*Wilson v. State Bd. of Educ.,*
   75 Cal. App. 4th 1125 (1999) ............................................................. 17

**Statutes**

28 U.S.C. § 2254 ................................................................................. 21

Cal. Educ. Code § 47601 ..................................................................... 18

Cal. Educ. Code § 47607 ..................................................................... 17

Cal. Educ. Code § 47610 ..................................................................... 17

Cal. Educ. Code § 47633 ..................................................................... 18

Cal. Educ. Code § 47634.1 .................................................................. 18

California Penal Code § 186.10 ............................................................ 18

California Penal Code § 489 ................................................................. 29

California Penal Code § 504 ......................................................... *passim*

California Penal Code § 514 ......................................................... *passim*

California Penal Code § 1170(h) .......................................................... 31

California Penal Code § 3450 *et seq.* ................................................... 20

California Revenue and Taxation Code § 19705(a) ............................... 18

**Other Authorities**

*Couzens & Bigelow, Felony Sentencing After Realignment (July 2013 rev.)* ........................................................................................... 30

CALCRIM 1806 .................................................................................. 23

Witkin, Cal. Crim. Law (4th) (2012) .................................................. 23

# TABLE OF EXHIBITS

**Trial Exhibit 1:**    **Ivy Academia Charter Petition, October 2003**

**Trial Exhibit 2:**    **Ivy Academia Charter Renewal, submitted May 22, 2007**

**Trial Exhibit 6:**    **Articles of Incorporation, Alternative Schools, Inc.**

**Trial Exhibit 13:**    **Select Board Agendas and Minutes**

**Trial Exhibit 17:**    **American Express Charges Schedule**

**Trial Exhibit 24:**    **Lease, March 30, 1984, between A.J. Levine and Amoroso Development Company, Inc.; First Amendment to Lease**

**Trial Exhibit 25:**    **Standard Sublease Multi-Tenant, June 5, 2004, between J&N Amoroso Family Investments and Academy Just for Kids**

**Trial Exhibit 26:**    **Assignment of Assumption of Lease, September 1, 2004, between Academy Just for Kids and 26 Alternative Schools; Guarantee of Sublease; Addendum to Standard Sublease; Second Amendment to Sublease**

**Trial Exhibit 31:**    **Entity Documents for Loan #3000700 Dated June 1, 2006 and Change in Terms Dated August 7, 2006 & March 2, 2009**

**Trial Exhibit 73:**    **Ivy Academia Audited Financial Statements, June 30, 2005**

**Trial Exhibit 74:**    **Ivy Academia Audited Financial Statements, June 30, 2008**

**Trial Exhibit 202:**    **Ivy Academia Audited Financial Statements, June 30, 2006**

**Trial Exhibit 205:**    **Ivy Academia Audited Financial Statements, June 30, 2007**

**Trial Exhibit 214:**    **QuickBooks excerpt, De Soto Campus Rent & Lease, July 2007–June 2008**

**Trial Exhibit 250:**    **Ivy Academia Audited Financial Statements, June 30, 2009**

**Trial Exhibit 251:**    **Ivy Academia Audited Financial Statements, June 30, 2010**

**Trial Exhibit 313:**    **Market Rent Analysis, 6051 De Soto Avenue, CBRE**

**INTRODUCTION**

Yevgeny (Eugene) Selivanov is before this Court because the State of California has punished him for conduct that was not criminal under California's embezzlement law at the time he engaged in it, but rather was made criminal by the California Court of Appeal's novel and retroactive expansion of the otherwise narrow and precise definition of that law.  This retroactive expansion of California's embezzlement law eliminated the required fair warning that a criminal statute must provide as to the conduct that it prohibits and thus violated Mr. Selivanov's right to due process under the Fifth and Fourteenth Amendments. *Bouie v. City of Columbia*, 378 U.S. 347(1964); *United States v. Lanier*, 520 U. S. 259, 266 (1997).

Mr. Selivanov is also before this Court because his criminal sentence was increased beyond its statutory limits based on facts found to be true by the trial judge and not by the jury beyond a reasonable doubt as commanded by the Sixth and Fourteenth Amendments.  *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Alleyne v. United States*, 570 U.S. 99 (2013).

These constitutional violations entitle Mr. Selivanov to relief in this Court.

**STATEMENT OF FACTS**

**A.    The Entities Involved: Ivy Academia Charter School and Alternative Schools, Inc.**

1.     Ivy Academia Charter School was started by Mr. Selivanov and his wife Tatyana Berkovich to provide a quality public school education with an emphasis on entrepreneurship.  [Ex. 1 at 3.]  The original charter school application was submitted in October 2003.  [*Id*. at 1.]

2.     Ivy Academia opened its doors to students in September 2004. [4RT 1539; Ex. 73 at 11.][1]  Despite California's budget woes, Ivy Academia was able to

---

[1]    The Reporter's Transcript (hereinafter, "RT") in this case consists of 22 volumes.  The Clerk's Transcript (hereinafter, "CT") in this case consists of 27

offer: (1) small class sizes with a low student-to-teacher ratio; and, (2) academic enrichment classes such as music appreciation and foreign language instruction (Spanish, French, Mandarin and Russian) beginning in the first grade. [Ex. 2 at 1-6.] Ivy Academia petitioned for a renewed charter in July 2007. [4RT 1586, Ex. 2.] In June 2008, based on its successful first five years, Ivy Academia's petition for renewal was approved by LAUSD and its charter renewed for five more years. [4RT 1529-30; 15RT 4819, 4649.]

3. Ivy Academia was regularly audited by the Charter Schools Division of LAUSD, and those audits included site visits, interviews with staff, parents, management, and board members, with a focus on governance and fiscal management. [4RT 1424, 1526-27, 1630-33; 14RT 4690-91.]

4. For all years in question, Ivy Academia was also audited by two independent accounting firms—first, by Anderson, Satuloff, Machado and Mendelsohn, CPAs, and, later, by Vicenti, Lloyd, and Stutzman LLP. Both of these independent accounting firms were approved to be charter school auditors by the California State Controller. [4RT 1587-92.] These independent accounting firms prepared publicly available, annual audited financial statements for Ivy Academia. [*See* Ex. 73 (FY 2005 Statement); Ex. 202 (FY 2006 Statement); Ex. 205 (FY 2007 Statement), Ex. 74 (FY 2008 Statement); Ex. 250 (FY 2009 Statement); Ex. 251 (FY 2010 Statement).] The annual audits were mandatory. [4RT 1587-88.]

5. Alternative Schools, Inc. was the non-profit public benefit corporation that operated Ivy Academia, and the owner of the funds Mr. Selivanov supposedly embezzled. Alternative Schools, Inc. was established on May 11, 2004 (after the charter school petition was submitted to and approved by LAUSD) for the purpose of operating Ivy Academia. [Ex. 6.]

---

volumes. For the Court's convenience, petitioner attaches only the volumes cited to in this petition. Each cite to the record begins with the number of the volume to which the citation is made.

**B.   The Charges Under Review**

**1.   The American Express Card Expenditures**

6.    During his tenure at Ivy Academia, Mr. Selivanov used an American Express credit card ("AMEX Card") for expenses connected with Ivy Academia. [9RT 3051.]  The prosecution challenged Ivy Academia's payment of some of Mr. Selivanov's AMEX Card charges as embezzlement (count 2).  The gist of the prosecution's claim was that Mr. Selivanov fraudulently appropriated Ivy Academia's property when Ivy Academia paid American Express for certain purchases Mr. Selivanov made with the AMEX Card.  In particular, the prosecution challenged Mr. Selivanov's use of the AMEX Card to pay for business meals and teacher appreciation events between the years 2005 and 2010, which were then paid for by Ivy Academia.[2]  [9RT 3053-54; Ex. 17 (highlighting in yellow amounts "disallowed").]

7.    To support its allegations regarding the AMEX Card, the prosecution called Connie Delos Santos, a financial analyst at LAUSD-OIG and a CPA.[3]  [9RT 3022-23.] Ms. Delos Santos testified that she reviewed Ivy Academia's records, including AMEX Card statements, vendor credit card receipts, and Ivy Academia expense reports, and created a compilation of all the AMEX Card charges from January 2005 to January 2010. [9RT 3047; Ex. 17.]  She then highlighted in yellow each purchase she deemed to be an inappropriate use of Ivy Academia's funds given the funds' purported "public" nature. [9RT 3053-54; 10RT 3389-91.]

---

[2]    The issue at trial was not whether these were, in fact, business-related meals and teacher appreciation events, but whether Ivy Academia's funds should have been used to pay for them.

[3]    Ms. De Los Santos was a category "G" CPA.  As such, she could not sign-off on audit reports. [11RT 3660.]  Her experience auditing charter schools was limited to two schools, including Ivy Academia. [10RT 3391.]

8.     Ms. Delos Santos testified as to which AMEX Card purchases were inappropriate based on certain pre-determined criteria that she had devised.  Ms. Delos Santos inexplicably disallowed all meals charged by Mr. Selivanov to the AMEX Card, unless the meal accompanied a business meeting lasting more than five hours, or unless the meal was related to a conference taking place away from Los Angeles. [10RT 3437-38.]  She also disallowed all teacher appreciation events charged to the AMEX Card unless the event had a specifically delineated professional development component. [11RT 3659-60.]

9.     Ms. Delos Santos could not cite to any particular rule, regulation, or statute that informed her decision to disallow these business-related meals and teacher appreciation events,[4] but noted that she did so because, in her opinion, the funds used to pay for the meals were "public funds," and those, again, in her opinion, could not be used to pay for business-related meals and teacher appreciation events outside of the restrictions she had set. [*Id*.; 10RT 3414-20.]

10.     The prosecution also presented testimony from Marina Pilyavskaya— Ivy Academia's bookkeeper. [5RT 1815.]  Ms. Pilyavskaya explained Ivy Academia's process for review and approval of the AMEX Card expenses.  She testified that when she received the monthly AMEX Card statement from American Express, she typed-up an itemized expense report according to the purchases reflected on the AMEX Card statement.  She then asked Mr. Selivanov for his credit card receipts.  [5RT 1852-53; 1937-38.]  Once she received the receipts from Mr. Selivanov, Ms. Pilyavskaya attached them to the itemized expense report that she had typed up and submitted them both to Ivy Academia's board member (and board treasurer) Arthur Sarkisian, for approval.  [5RT 1853.]  Only once the

---

[4]     Accordingly, it was undisputed at trial that no document existed that put Mr. Selivanov on notice as to Ms. De Los Santos' arbitrary restrictions.

expenses were approved by Mr. Sarkisian was the check to American Express issued. [5RT 1929.]

11.     Ms. Pilyavskaya also testified that, as part of Ivy Academia's mandatory annual audit, Ivy Academia's independent auditors requested and received all documentation related to the American Express charges.  Ms. Pilyavskaya provided the independent auditors with all the AMEX Card statements and the associated purchase receipts, as well as other documents the auditors requested, including board of directors' minutes, contracts, bank statements, payroll documents, invoices, and checks.  [5RT 1930-34.]  Ms. Pilyavskaya testified that she never kept anything from the independent auditors, nor was she ever instructed to do so by Mr. Selivanov. [*Id.*]

12.     Finally, the jury heard testimony from Aaron Eairleywine, a charter school financial overseer with the Charter Schools Division of LAUSD, who was responsible for the financial oversight of Ivy Academia, [4RT 1421] and from Patricia Smith, a representative of the Los Angeles County Office of Education's finance department. [4RT 1671.]

13.     Mr. Eairleywine testified that throughout the time he was responsible for Ivy Academia's financial oversight, the school never received a rating lower than proficient for its financial operations—the second highest available rating. [4RT 1632.]  Mr. Eairleywine also testified that he was aware, as early as 2006, that the AMEX Card was used to pay for various meals.  [4RT 1583.]  Nonetheless, Mr. Eairleywine never informed Mr. Selivanov that there was any concern within LAUSD regarding these AMEX Card expenditures, and never told Mr. Selivanov to stop making them, even when Ivy Academia's charter was up for renewal.  [4RT 1584, 1587.]

14.     Both Eairleywine and Smith were asked whether the expenditures at issue were permissible.  Both testified that there is no blanket prohibition on these types of expenditures and that their propriety would depend on their circumstances.

1  [*See, e.g.*, 4RT 1610-11 (Eairleywine); 4RT 1694-1697 (Smith).]  Both stated,

2  however, that LAUSD and the Los Angeles County Office of Education generally

3  did not classify "activities for the pleasure of faculty and teachers and staff such as

4  bowling," and "after hours dinners off campus" as expenses that charter schools and

5  their operators were authorized to make.  *See People v. Selivanov*, 5 Cal. App. 5th

6  726, 751 (Ct. App. 2016), *as modified on denial of reh'g* (Dec. 13, 2016), *review*

7  *denied* (Mar. 15, 2017).

8  **2.  The Capital Improvement Loan and Its Repayment**

9  15.  In 2006, Ivy Academia borrowed $600,000 from Western Commercial

10  Bank to pay for tenant improvements at its 6051 De Soto campus (the "Western

11  Commercial Bank Loan").  [Ex. 31; Ex. 13 at 46.]  That loan was personally

12  guaranteed by Mr. Selivanov—at no additional cost to Ivy Academia. [Ex. 31 at 11-

13  14.]

14  16.   The De Soto facility was originally made available to Ivy Academia

15  for use through the help of AJFK LLC (and Mr. Selivanov and Ms. Berkovich) as

16  the facility's landlord was not willing to lease the facility directly to Ivy Academia,

17  given that Ivy Academia had no financial track record. [Ex. 13 at 45; 8RT 2868-

18  69.]  AJFK LLC (Mr. Selivanov and Ms. Berkovich's private company) therefore

19  leased the facility for ten years, and Mr. Selivanov and Ms. Berkovich (as part of

20  AJFK LLC's lease) personally guaranteed that the rent would be paid. [Ex. 25.]

21  The lease was *not* between the landlord and Ivy Academia.  In fact, at no time was

22  Ivy Academia in a direct lessee-lessor relationship with the landlord [8RT 2861,

23  2869.]

24  17.  From 2004 until 2007, AJFK LLC assigned the De Soto lease to Ivy

25  Academia "at cost," with no additional compensation for the risk that AJFK LCC

26

27

28

14

(and, based on their guarantee, Mr. Selivanov and Ms. Berkovich) undertook.[5] [Ex. 26; Ex. 13 at 45.]

18.     On October 2, 2008, Ivy Academia's board of directors discussed and voted on a new lease and loan arrangement that, among other things, changed the payments for the Western Commercial Bank Loan and the lease.  Under the new lease and loan arrangement, eGeneration (previously AJFK LLC), the company jointly owned by Mr. Selivanov and Ms. Berkovich, assumed the Western Commercial Bank Loan in the amount of $520,000.  At the same time, Ivy Academia's lease payments to eGeneration for use of the De Soto facility were set at 90% of market, or $43,870.05 a month.[6] [Ex. 13 at 46.]  In its discussion, the board of directors discussed the benefit of these changes to Ivy Academia, including the fact that it would allow the school to strengthen its balance sheet. [*Id.*]

19.     Neither Mr. Selivanov nor Ms. Berkovich participated in the vote or the preceding board of directors' discussion regarding the lease and loan arrangement. [*Id.*]  After the transaction was approved by the board of directors, a contract to the same effect was drafted and signed by the relevant parties— Alternative Schools, Inc. (the operator of Ivy Academia) and eGeneration (Mr. Selivanov and Ms. Berkovich's private company). [Ex. 13 at 47.]  The agreement, entitled "Assignment Assumption of Lease," was made effective retroactively, per the board of directors' resolution, to July 1, 2007. [Ex. 13 at 46.]

---

[5]   This type of "sub-lease" arrangement is common for charter schools in California, as many new charter schools cannot lease facilities themselves, and resort to dependence on their founders' financial wherewithal for this purpose. [14RT 4663-64.]

[6]   The De Soto facility's market rent value was submitted to the board of directors of Ivy Academia through the broker's opinion of value of Lee & Associates, [Ex. 13 at pp. 49-50], and confirmed at trial through the testimony of Robert Gutzman, a licensed real-estate appraiser with the firm CB Richard Ellis. [18RT 5813; Ex. 313 at 2-3.]

20.     Under the Assignment Assumption of Lease agreement, Ivy Academia (the assignee) agreed to make monthly payments to eGeneration (the assignor)—or its designee—in the amount of $43,870.05 for the use of the De Soto facility and the lease guarantees.  [Ex. 13 at 47.]  In reality, Ivy Academia did not pay $43,870.05 to eGeneration.  Rather, Ivy Academia paid eGeneration's designees: making a rent payment each month to eGeneration's landlord[7] and making a loan payment each month to Western Commercial Bank.  [8RT 2720-21; 17RT 5522-23.]

21.     Accordingly, Ivy Academia's payments to the landlord and to Western Commercial Bank were recorded in the school's QuickBooks as "rent" payments.[8] [5RT 1947-48; Ex. 214.[9]]  In other words, Ivy Academia continued to pay Western Commercial Bank for the Loan (as it did before), but each of those payments was deducted from Ivy Academia's lease liability to eGeneration for use of the De Soto facility.  [12RT 3916, 3923-24; 8RT 2727-28; 17RT 5525.][10]  Ivy Academia's continued payments to Western Commercial Bank were challenged by the prosecution as embezzlement under count 40.[11]

_____

[7]   J&N Amoroso was not the original owner of the property, but held it under a lease with the property's master landlord, A.J. Levine. [8RT 2855; Ex. 24.]

[8]   No allegation was made that Ivy Academia's books contained amounts that were incorrect.

[9]   Ivy Academia's payments to J&N Amoroso were recorded in the QuickBooks as payments to Big Valley Self-Storage. [Ex. 214.]  Big Valley Self-Storage was a division of J&N Amoroso. [7RT 2413.]

[10]   Ivy Academia's payments to J&N Amoroso and Western Commercial Bank did not total $43,870.05.  The remaining lease liability to eGeneration was not paid to eGeneration; instead, it was booked as debt on Ivy Academia's books.  [12RT 3916.]

[11]   The People also charged Mr. Selivanov with four counts of embezzlement and two related money laundering counts (Counts 8, 19, 22, 23, 25, and 26) for transferring money out of Ivy Academia's account against money owed to Mr. Selivanov and eGeneration.  These charges also depended on the assumption that

### C.    California Charter School System

#### 1.    The Charter School Act of 1992

22.    The Charter Schools Act was enacted, in part, to "disrupt entrenchment" of negative traits in the bureaucracy of the California public school system, *Wilson v. State Bd. of Educ.*, 75 Cal. App. 4th 1125, 1130 (1999); to give charter schools "substantial freedom to achieve academic results free of interference by the public educational bureaucracy." *Wells v. One2One Learning Found.*, 39 Cal. 4th 1164, 1201 (2006).

23.    California Education Code section 47610, commonly referred to as the "Mega-Waiver" provision, establishes the basic principle that permits charter schools to operate free of the rules that bind traditional public schools—including rules regarding the expenditure of funds—so long as the charter school meets or exceeds academic standards set out in Education Code section 47607(b) and/or its charter petition.  Cal. Educ. Code §§ 47607(b), 47610.  California Education Code section 47610 states: "A charter school shall comply with this part [Education Code Part 26.8 (the CSA)] and all of the provisions set forth in its charter, but is otherwise exempt from the laws governing school districts."  Cal. Educ. Code § 47610 (emphasis added).

#### 2.    The Power to Determine How Charter School Funds are Spent

24.    Ivy Academia, like all California charter schools, receives funds from public sources.   However, the expenditure of those funds is governed not by the strictures of a traditional public school district, but by the dictates of a charter school's charter and governing body—its board of directors.  This is an extension of the performance-based principle that underlies the Charter Schools Act.  "The

the Lease/Loan agreement was not permitted even though it was considered and approved by the school's governing board.  The requested review by this Court would therefore implicate these charges as well.

autonomy, and independent responsibility, of charter school operators extend, in considerable degree, to financial matters." *Wells*, 39 Cal. 4th at 1201.  The intent is to challenge charter school leaders to find innovative practices and a more effective use of public funds to "provide vigorous competition within the public school system to stimulate continual improvements in all public schools."  Cal. Educ. Code § 47601(g).

25.     Two types of grants dominated the public funds Ivy Academia received during the relevant years—general purpose grants, Cal. Educ. Code § 47633(c), which "may be used for any public school purpose determined by the governing body of the charter school" Cal. Educ. Code § 47633(c)); and categorical block grants, Cal. Educ. Code § 47634.1(h), which may be used "for any purpose determined by the governing body of the charter school."  Cal. Educ. Code § 47634.1(h).  By law, therefore, it was the governing body of Ivy Academia that was authorized to spend these public funds, without regard to the restrictions generated by the rules, policies, and laws governing traditional public schools.

## PROCEDURAL HISTORY AND
## JURISDICTIONAL ALLEGATIONS

### A.     Conviction on which petition is based

26.     Offenses involved: Embezzlement pursuant to California Penal Code section 504 (six counts), Money Laundering pursuant to California Penal Code section 186.10(a) (two counts), and violation of California Revenue and Taxation Code section 19705(a) (ten counts).

27.     For each of the counts of convictions pursuant to California Penal Code section 504, the trial court (but not the jury) found that funds embezzled were public funds, pursuant to California Penal Code section 514.

28.     Case number: BA372244.

29.     Date of conviction: April 5, 2013.

30.   Date of sentence: October 4, 2013.

31.   Total length of sentence: four years, eight months.

32.   Plea: not guilty.

33.   Kind of trial: jury.

**B.    Appeal to the California Court of Appeal**

34.   Mr. Selivanov filed a timely notice of appeal on November 15, 2013, and filed an amended notice of appeal on February 10, 2014.

35.   Assigned case number: B252894.

36.   Mr. Selivanov challenged his conviction on the following grounds: insufficient substantial evidence; jury instruction errors; admission of hearsay evidence without a proper foundation; abuse of discretion related to victim restitution; *Apprendi* error.

37.   Date of decision: the California Court of Appeal issued its published opinion on November 17, 2016.  *See People v. Selivanov*, 5 Cal. App. 5th 726 (Ct. App. 2016), *as modified on denial of reh'g* (Dec. 13, 2016).[12]

38.   Result: conviction affirmed.

**C.    Petition for Review in the California Supreme Court**

39.   Mr. Selivanov filed a timely petition for review in the California Supreme Court and a request for an order to de-publish the opinion on December 27, 2016.

40.   Assigned case number: S239154.

41.   Date of Decision: March 15, 2017.

42.   Result: denied without citation.

43.   Mr. Selivanov did not file a petition for a writ of certiorari in the United States Supreme Court.

---

[12]   On December 13, 2016, the California Court of Appeal modified its opinion with no change in the judgment.

44.     Apart from the instant petition, Mr. Selivanov had not filed any habeas corpus petitions in federal court.[13]

**D.     Jurisdiction and Venue**

45.     Mr. Selivanov is currently not in the custody of the California Department of Corrections and Rehabilitation ("CDCR").

46.     Upon his release from CDCR's custody, on May 26, 2015, Mr. Selivanov was placed on Post-Release Community Supervision, pursuant to the Post-release Community Supervision Act of 2011.  Cal. Pen. C. § 3450 *et seq.*

47.     Mr. Selivanov was discharged from community supervision on May 26, 2016 after a 12-month period of successful supervision where he had no returns to custody for any violation of his community supervision.

48.     The offending ruling by the California Court of Appeal, which is the basis for claim one of this Petition, was handed down on November 17, 2016 and modified on December 13, 2016.

49.     While Mr. Selivanov is not currently in actual custody (nor on probation or parole), he nonetheless suffers disabilities and restraints on his liberty as a result of his having been convicted of ten felonies.  Chief among them is Mr. Selivanov's inability to hold any office of honor, trust, or profit in California, pursuant to California Penal Code section 514.

50.     These restraints will be just as real and substantial as those that were found to warrant an expansion of the availability of the writ of habeas in the past to persons not in actual custody.  Mr. Selivanov will not have the right to do many things that free citizens are entitled to do, even those with felony convictions.

---

[13]   On October 22, 2013, Mr. Selivanov filed a petition for a writ of habeas corpus with the California Court of Appeal, challenging the trial court's decision not release him on bail pending appeal.  On November 4, 2013, the California Court of Appeal summarily denied Mr. Selivanov's petition.

51.     Such disabilities and restraints are sufficient to give him standing to challenge his convictions in federal habeas corpus regardless of whether the filing of his petition occurred before or after the termination date of the challenged sentence.

52.     It is not actual physical custody during service of a sentence that gives standing in habeas corpus; it is instead the restraint on liberty, whether physical or of a more subtle nature.  *See Glover v. State of N.C.*, 301 F. Supp. 364, 368 (E.D.N.C. 1969).  *Brooks v. North Carolina Dept. of Correction*, 984 F.Supp. 940 (1997).

53.     Mr. Selivanov currently resides in Calabasas, Los Angeles County, California.

## STANDARDS UNDER THE ANTI-TERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996 ("AEDPA")

54.     The Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA, or the Act) generally limits a federal court's ability to grant relief on claims that were adjudicated "on the merits" in state court proceedings, unless the adjudication resulted in a decision that was "contrary to" or involved an "unreasonable application of" clearly established federal law as determined by the United States Supreme Court, or if the adjudication resulted in a decision that was based on an "unreasonable determination of the facts[.]"28 U.S.C. § 2254(d)(1)-(2).

55.     Section 2254(d) is phrased in the disjunctive, meaning that a petitioner overcomes this limitation on relief by satisfying either section 2254(d)(1) or (d)(2). Once a petitioner satisfies this standard, his claim is reviewed *de novo*. *Nunes v. Mueller*, 350 F.3d 1045, 1051 (9th Cir. 2003).

# CLAIMS FOR RELIEF

### CLAIM ONE: MR. SELIVANOV'S RIGHT TO DUE PROCESS WAS VIOLATED BECAUSE THE CALIFORNIA COURT OF APPEAL RETROACTIVELY EXPANDED CALIFORNIA'S EMBEZZLEMENT LAW THEREBY ELIMINATING THE REQUIRED FAIR WARNING THAT A CRIMINAL STATUTE MUST PROVIDE AS TO THE CONDUCT THAT IT PROHIBITS

56.     The record in this case points to uncontroverted evidence that Mr. Selivanov's challenged "embezzlements"—primarily his AMEX Card charges and the Lease/Loan transaction—were all approved by the funds' owner: the school's board of directors, or one of its members.

57.     The California Court of Appeal acknowledged these approvals in its opinion.  *See, e.g., People v. Selivanov*, 5 Cal. App. 5th 726, 739–40, 742–4,  (Ct. App. 2016), *as modified on denial of reh'g* (Dec. 13, 2016), *review denied* (Mar. 15, 2017).

58.     Despite these approvals by the funds' owner, the California Court of Appeal held that Mr. Selivanov was guilty of embezzling the school's funds because "charter schools operate under the authority not only of their own charters and governing boards but also the broader umbrella of the LAUSD Charter School Division." *People v. Selivanov*, 5 Cal. App. 5th at 751.  Per the Court of Appeal's ruling, even if the owner of the funds approves an expenditure, there can still be embezzlement, and the final arbiter of these prohibited actions is, as a result, not the owner of the funds, but rather the school's authorizers, speaking through their employees. *Id.*

59.     This application of the law of embezzlement is a *novel* and *retroactive* expansion of the otherwise narrow and precise definition of that law in California.

60.     California Penal Code section 504, which underlined Mr. Selivanov's convictions, is "an ordinary embezzlement statute which, like several others, specifically mentions the persons who come within the fiduciary relationships." *See* 2 Witkin, Cal. Crim. Law (4th), Crimes-Property § 43 (2012).

61.     "Fraudulent intent is an essential element of embezzlement." *People v. Sisuphan*, 181 Cal. App. 4th 800, 813 (2010).  "A person acts fraudulently when he or she takes undue advantage of another person or causes loss to that person by breaching a duty [of] trust or confidence."  CALCRIM 1806.

62.     In determining whether a defendant's intent was fraudulent at the time of the taking, the issue is whether he or she intended to use the property at issue for a purpose other than that for which the *principal* entrusted it to him or her.  *Id.*; *see also People v. Hodges*, 153 Cal. App. 2d 788, 793 (1957) ("The gist of [embezzlement] is the appropriation to one's own use of property delivered to him for devotion to a specified purpose other than his own enjoyment of it"]; *People v. McClain*, 140 Cal. App. 2d 899, 900 (1956) ("The intent essential to embezzlement is the intent to fraudulently appropriate the property to a use and purpose other than that for which it was entrusted.")  "The offense of embezzlement contemplates a principal's entrustment of property to an agent for certain purposes and the agent's breach of that trust by acting outside his authority in his use of the property." *Sisuphan,* 181 Cal. App. 4th at 813-14.

63.     At trial, the prosecution failed to present evidence showing, or even inferring, that Mr. Selivanov used the funds at issue for a purpose other than that for which the funds' owner (the charter school) intended. The *principal,* in other words, had no issue with the manner in which the funds were spent, as demonstrated by the specific approvals the school's governing board gave for the actions at issue.

64.     Nonetheless, the Court of Appeal affirmed Mr. Selivanov's embezzlement convictions by adding an additional avenue for liability.  Under the Court of Appeal's novel construction of the embezzlement offense, a person may be guilty of embezzlement even if he or she used the property at issue for a purpose that *conforms* with the principal's wishes, as long as a third party, identified *post-hoc*, disapproved of the spending.

23

65.     Because the Court of Appeal created an additional avenue of embezzlement liability after the fact, Mr. Selivanov was punished for conduct that was not criminal under California's embezzlement law at the time Mr. Selivanov committed it.

66.     This retroactive expansion of California's embezzlement law eliminated the required fair warning that a criminal statute must provide as to the conduct that it prohibits and thus violated Mr. Selivanov's right to due process under the Fifth and Fourteenth Amendments. *Bouie v. City of Columbia*, 378 U.S. 347(1964); *United States v. Lanier*, 520 U. S. 259, 266 (1997).

67.     The Court of Appeal's ruling is squarely at odds with this basic notion of fairness.  Simply put: Mr. Selivanov had no opportunity to know which of his "takings"—all approved by the owner of the funds—were nonetheless criminal embezzlements, because they were criminalized years later, by virtue of the Court of Appeal's expansion of the offense of embezzlement.  The otherwise precise law of embezzlement has therefore been unforeseeably and retroactively expanded by judicial construction.

68.     "There can be no doubt that a deprivation of the right of fair warning can result . . . from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language." *Bouie v. City of Columbia*, 378 U.S. 347, 352 (1964).  "[J]udicial enlargement of a criminal act by interpretation is at war with a fundamental concept of the common law that crimes must be defined with appropriate definiteness." *Id.* (citing *Pierce v. United States*, 314 U.S. 306, 311 (1941)).  "Indeed, an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law, such as Art. I, s 10, of the Constitution forbids." *Bouie*, 378 U.S. at 353.

69.     Penal Code 504 (like other forms of embezzlement) contemplates "a principal's entrustment of property to an agent for certain purposes and the agent's

1    breach of that trust by acting outside his authority in his use of the property."

2    *Sisuphan*, 181 Cal. App. 4th at 813-14.

3         70.    Much like in *Bouie,* section 504 of California's Penal Code did not

4    give Mr. Selivanov fair warning, at the time of his conduct in question, that the acts

5    for which he now stands convicted were rendered criminal by the statute. *Id.* at

6    355.  Nowhere in Penal Code 504, or in its then-controlling judicial construction,

7    did it indicate that a defendant could be guilty of embezzlement even when acting

8    *inside* his authority when using the property.  Nothing in the statute indicated that it

9    also prohibited the use of property against the wishes of a yet-to-be-determined

10   third party.

11        71.    And indeed, in Mr. Selivanov's case, the jury instructions identified

12   *Ivy Academia* as the funds' owner and made no mention of the LAUSD or any other

13   party in that context.  The instructions also instructed the jury that a "good faith

14   belief in acting with authorization to use the property is a defense."  [24CT 4481

15   (jury instructions given).]

16        72.    Mr. Selivanov, therefore, did not violate the California embezzlement

17   statute as it was written; he received authorization to use the funds in question as he

18   did from the only entity that mattered under the law: Ivy Academia—the funds'

19   owner.  So far as the California embezzlement statute was concerned, Mr.

20   Selivanov was given not only no "fair warning," but no warning whatever, that his

21   use of the funds entrusted to him by Ivy Academia would violate the embezzlement

22   statute.

23        73.    The Court of Appeal's decision likewise violated Mr. Selivanov's due

24   process rights because it allowed non-principals (in this case, the LAUSD and the

25   Los Angeles County District Attorney) to override, after the fact, the decisions of

26   the funds' owners.

27        74.    The Court of Appeal's ruling effectively "delegate[d] basic policy

28   matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective

1  basis, with the attendant dangers of arbitrary and discriminatory application."

2  *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

3        75.    Indeed, at trial, the prosecution relied upon the testimony of Ms. Delos

4  Santos, a financial analyst at LAUSD-OIG and a CPA with little prior experience in

5  charter school audits.  To evaluate which AMEX Card purchases she deemed

6  "disallowed," Ms. Delos Santos came up with her own criteria: she disallowed *all*

7  meals charged by Mr. Selivanov to the AMEX Card, unless the meal accompanied

8  a business meeting lasting more than five hours, or unless the meal was related to a

9  conference taking place away from Los Angeles. [10RT 3437-38.]

10        76.    Ms. Delos Santos also disallowed all teacher appreciation events

11  charged to the AMEX Card unless the event had a specifically delineated

12  professional development component. [11RT 3659-60.]

13        77.    Ms. Delos Santos could not cite to any particular rule, regulation, or

14  statute that informed her decision to disallow, after the fact, these particular meals

15  and teacher appreciation events (but not others).[14] She equally could not explain

16  why she picked these criteria (and not others).

17        78.    By applying its post-hoc novel construction of embezzlement, the

18  California Court of Appeal effectively endorsed Ms. Delos Santos' arbitrary and

19  capricious analysis of which of Mr. Selivanov's use of funds was and was not

20  criminal.

21        79.    The California Court of Appeal's decision was "contrary to" clearly

22  established federal law as determined by the United States Supreme Court because

23  in applying its new construction of the California embezzlement statute to affirm

24  Mr. Selivanov's convictions, the Court of Appeal has deprived Mr. Selivanov of

25  rights guaranteed to him by the Due Process Clause.

26

27  —————————

28  [14]  Accordingly, it was undisputed at trial that no document existed that put Mr.
Selivanov on notice as to Ms. Delos Santos' arbitrary restrictions.

**CLAIM TWO: MR. SELIVANOV'S RIGHT TO A JURY TRIAL WAS VIOLATED BECAUSE HIS CRIMINAL SENTENCE WAS INCREASED BEYOND ITS STATUTORY LIMITS BASED ON FACTS FOUND TO BE TRUE BY THE TRIAL JUDGE AND NOT BY THE JURY BEYOND A REASONABLE DOUBT**

### A.    Procedural Background

80.    The Information in this case charged Mr. Selivanov with six counts of embezzlement by a private or public officer, pursuant to California Penal Code section 504. As to each of these counts, the Information added the special allegations that "the said embezzlement and defalcation was of [the] public funds within the meaning of [California] Penal Code section 514."

81.    Mr. Selivanov has never admitted these allegations, nor did he waive his right to a jury trial concerning these allegations.

82.    The prosecution never sought to have the jury make a finding on these allegations, and nothing in the verdict forms refers to or answers the question of whether the funds involved in the embezzlement counts were "public funds" pursuant to California Penal Code section 514.

83.    In fact, with respect to these embezzlement counts, the jury was specifically instructed that the owner of the funds in question was Alternative Schools, Inc., dba Ivy Academia Charter School. The jury was never instructed it had to find the funds involved were "public."

84.    During the sentencing hearing (without any notice) the prosecution asked the trial court to make a California Penal Code section 514 finding "in light of them being public officials." [22RT 10297.] The prosecution added (correctly) that "that would have an impact in terms of the sentencing." [*Id*.] Thereafter, the trial court proceeded to sentence the defendants but made no section 514 finding. Just before Mr. Selivanov was taken into custody, the prosecution again requested that the court make the finding:

> Excuse me, your honor, before the defendant leaves, pursuant to penal code 514, we believe we need a finding made by the court that this involved embezzlement of

public funds, because that would render the defendants ineligible to hold public office.

[22RT 1032.]

85. Over the defense's objections, the trial court acquiesced to the prosecution's request:

> I do make the finding that these were public funds and that he embezzled public funds, and the public funds being the funds from the school, Ivy Academia, which is a public school.

[22RT 10313.]

86. Mr. Selivanov moved the trial court to correct his sentence, but the trial court refused to strike its section 514 findings.

**B.    Argument**

87. The trial court's section 514 finding was contrary to clearly established federal law as determined by the United States Supreme Court.

88. The trial court's section 514 finding violated *Apprendi v. New Jersey,* 530 U.S. 466 (2000) (*Apprendi*) and *Alleyne v. United States,* 570 U.S. 99 (2013) (*Alleyne*), which require any fact that increases the statutory maximum (*Apprendi*) or mandatory minimum (*Alleyne*) punishment to be found by a jury beyond a reasonable doubt.

89. By making the contested section 514 finding, the trial court impermissibly increased Mr. Selivanov's maximum and minimum penalties in three distinct ways: (1) it removed California Penal Code section 504 from "wobbler" status; (2) it imposed mandatory state prison incarceration where probation is denied; and (3) it barred Mr. Selivanov from holding public office.

1.  **The trial court's section 514 finding increased Mr. Selivanov's punishment by removing the offenses from "wobbler" status**

90.     In California, embezzlement of money or property valued at more than $950, is, like its grand theft counterpart, a "*wobbler*"—a crime that "in the trial court's discretion, may be sentenced alternately as [a] felon[y] or misdemeanor[]." *People v. Superior Court (Alvarez)*, 14 Cal.4th 968, 974 (1997); *see also People v. Stanfill*, 76 Cal. App. 4th 1137, 1144-1145 (1999).   California Penal Code section 489(c) is the source of this discretion.   It provides that grand theft (with narrow exceptions not applicable here) is punishable "by imprisonment in a county jail not exceeding one year *or* pursuant to subdivision (h) of Section 1170." (emphasis added)

91.     Under this *wobbler* scheme, at sentencing, the trial court had the discretion to choose whether Mr. Selivanov should be subject to felony or misdemeanor punishment.   As a result, the punishment *floor* Mr. Selivanov faced was that provided in section 489 (c), "imprisonment in a county jail not exceeding one year."   Even if it was unlikely that the trial court would have exercised its discretion to sentence Mr. Selivanov as if he were convicted for misdemeanor embezzlement, it would have had that option.

92.     After the "public funds" finding was made, however, the trial court lost its discretion to sentence defendants to a misdemeanor punishment.   Under section 514, the embezzlement of public funds "is a felony, and is punishable by imprisonment in the state prison." Cal. Pen. C. § 514.   The minimum punishment to which Mr. Selivanov was subject accordingly rose to the low term of the felony triad—16 months—based on the trial court's finding.

93.     In *Alleyne*, the Supreme Court determined that "facts that increase the mandatory *minimum* sentence are [] elements [of the offense] and must be submitted to the jury and found beyond a reasonable doubt."   *Alleyne,* 570 U.S. at 108 (emphasis added).   "The essential point is that the aggravating fact produced a

29

higher range, which, in turn, conclusively indicates that the fact is an element of a distinct and aggravated crime.  It must, therefore, be submitted to the jury and found beyond a reasonable doubt." *Id.* at 116.

94.     The section 514 "public funds" finding had the effect of eliminating the trial court's discretion to sentence Mr. Selivanov to a *lower*, misdemeanor sentence, to be served in county jail.  In other words, while Mr. Selivanov was subject to felony punishment with or without the "public funds" finding, with the finding, he was subject *only* to felony punishment.  Under *Alleyne*, the finding should have therefore been made by the jury, not by the trial court.

> **2.     The trial court's section 514 finding increased Mr. Selivanov's punishment because it imposed mandatory state prison incarceration**

95.     Because of the trial court's section 514 "public funds" finding, Mr. Selivanov was *required* to serve his custodial time in state prison, as opposed to the local custody that is required for most offenders convicted of embezzlement under Realignment.[15]

96.     Time served locally is less punitive than time served in state prison.

97.     By making the section 514 "public funds" finding, the trial court took the option of local custody away without a jury finding, thus increasing—in violation of *Apprendi*—the punishment available for embezzlement pursuant to Penal Code section 504.

98.     Moreover, under Realignment, the trial court had discretion to suspend execution of a portion of Mr. Selivanov's county jail term and place him on

---

[15]   *See* Couzens & Bigelow, Felony Sentencing After Realignment (July 2013 rev.) at 102, which lists, in Appendix I, "504/514" as requiring a state prison sentence, compared with section 489(b), listed therein as punishable by local custody under section 1170, subdivision (h). *Available at* www.courts.ca.gov/partners/documents/felony_sentencing.pdf

mandatory supervision, which could have significantly reduced the period of actual custody (often called "split" or "blended" sentences).  *See* Cal. Pen. C. § 1170 (h)(5)(B); *People v. Wilcox*, 217 Cal. App. 4th 618, 621 (2013).  Again, this option was removed once the trial court made its section 514 finding because the embezzlement convictions were no longer subject to sentencing under Penal Code section 1170(h).

### 3.    The trial court's section 514 finding increased Mr. Selivanov's punishment because it barred Mr. Selivanov from holding public office

99.    The Court's "public funds" finding under Penal Code section 514 also violated *Apprendi* because it supported a disqualification from holding public office—an added penalty not available for simple embezzlement convictions under Penal Code § 504 alone.

100.    The lifetime ban on holding public office stemming from a section 514 finding is punitive.  It therefore provides an additional basis for finding that Mr. Selivanov had a right to a jury trial on the truth of the "public funds" allegation under the federal Constitution.

1

**PRAYER FOR RELIEF**

2
    Mr. Selivanov therefore requests that this Court:

3
    1.    Issue the writ of habeas corpus, vacate Mr. Selivanov's convictions

4
    and sentence, and grant any additional relief appropriate in the interest

5
    of justice

6
    2.    In the alternative, conduct an evidentiary hearing at which proof may

7
    be offered concerning all of the allegations in the Petition.

8

9
Dated:    June 12, 2018            Respectfully submitted,

10

11
                       KENDALL, BRILL & KELLY, LLP

12
                       By:  */s/Jeffrey H. Rutherford*

13
                           Jeffrey H. Rutherford

14

15
                       CROWELL & MORING LLP

16
                       */s/Nimrod Haim Aviad*

17
                       Nimrod Haim Aviad

18

19
                       Attorneys for Petitioner,

20
                       YEVGENY (EUGENE) SELIVANOV

21

22

23

24

25

26

27

28

1      **VERIFICATION**

2      I, Yevgeny Selivanov, declare and state as follows:

3          1.      I am the petitioner to whom the foregoing Petition for Writ of

4      Habeas Corpus relates.

5          2.      I have read the foregoing petition for writ of habeas corpus.  I affirm

6      that all the matters alleged here are true of my own personal knowledge or are

7      supported by the record in my trial and direct appeal, and by the attached exhibits.

8

9          I verify under penalty of perjury that the foregoing is true and correct.

10     Executed on June 12 2018, at Calabasas, California.

11

12

13                                              By: _____

14                                                  Yevgeny (Eugene) Selivanov

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    33